**UNITED STATES of America**

v.

**Alonzo ESTER, Defendant.**

**No. 77 Cr. 602.**

United States District Court,
S. D. New York.

Dec. 13, 1977.
On Motion to Reargue Feb. 1, 1978.

Robert B. Fiske, Jr., U. S. Atty., New York City, for the United States; Allen R. Bentley, Asst. U. S. Atty., New York City, of counsel.

Edward Panzer, New York City, for defendant.

LASKER, District Judge.

Alonzo Ester moves to suppress the introduction of eight ounces of heroin, found in his suitcase, as evidence against him in his prosecution for possession and distribution of narcotics. The motion is granted.

On June 17, 1977, Special Agent John Pope of the New York Joint Drug Enforcement Task Force was notified by Special Agent Johnson of the Los Angeles office of the Drug Enforcement Agency that a confidential source had informed him that one Donnie Lewis was leaving Los Angeles for New York to purchase cocaine. Johnson informed Pope that he had learned from American Airlines that sequential reservations for "D. Lewis", "A. Ester", and "M. Jones" had been made on a flight from Los Angeles to New York on June 17th. Although surveillance was begun at JFK Airport on the 17th, no one was observed to arrive who matched Lewis' description. On June 20th, however, Johnson again contacted Pope, this time with information that Lewis and his companions were actually in New York and were staying at the Hilton Hotel.

After ascertaining that a party of two, registered under the name "D. Lewis", was staying at the Hilton, federal narcotics agents began a regular surveillance of the hotel lobby and the area outside the hotel. Lewis was seen leaving the hotel, carrying luggage, on his way to the airport at 6:00 P.M. on June 20th, but he was not stopped by the agents who decided, after consultation with an Assistant United States Attorney, that they did not have probable cause to arrest him. When the agents learned from the hotel security police that the occupants of Room 1920, where Lewis had been staying, intended to remain, they booked the adjoining room in order to continue their observation. Their surveillance included looking through Room 1920's "fisheye" peephole and pressing a glass to the wall between the two rooms to listen for sounds.

Room service supplied Room 1920 with food on the evening of June 20th and again on the morning of June 21st, at which time the agents saw a woman, later identified as Marguerite Jones, place a tray of dishes in the hallway. At 8:00 A.M. on June 21st, Alonzo Ester [1] knocked on the door of Room 1920 and was admitted. He was carrying no luggage. The agents heard through the wall a conversation about returning to Los Angeles and shortly later saw Jones leave the room. She returned at 12:15 P.M., carrying a shopping bag, and the agents this time heard a woman say, in a raised voice: "I don't give a damn about the order. I'm going back to Los Angeles." At 12:55 P.M., Jones left the hotel. During the next three hours, Ester twice summoned the bellman to his room and both times sent him away with instructions to return later. Finally, at 3:30 P.M., Ester gave the bellman a grey suitcase fastened with a piece of string, and followed him down to the hotel lobby.

After Ester left his room, Agent Pope searched it and discovered a folded piece of paper in the trash can containing white powder. A cobalt field test established that the powder was cocaine.

---

1. Agent Paul Buceti testified at the suppression hearing that none of the agents was aware of Ester's identity until Buceti read the name on his luggage in the lobby of the Hilton shortly before Ester left for the airport. (Transcript at 86)

Ester apparently remained in the vicinity of the hotel lobby from 3:30 P.M. until 5:15 P.M. His suitcase was left at the bellman's desk during this period. At 5:15 he recovered his luggage and took a taxi to LaGuardia Airport. On arrival at the American Airlines Terminal, Ester left the cab and placed his suitcase and an attaché case on the sidewalk where they were picked up by a skycap. Agent Pope then approached Ester, identified himself, placed Ester under arrest and retrieved the luggage which was only a few feet away. Ester was handcuffed and placed in the back seat of a government car next to an agent, while Pope and another agent seated themselves in the front of the car. Pope gave Ester his *Miranda* warnings and the following conversation took place:

> "I asked if he had a key to the suitcase. He said he did. I said where. He said in his pocket. And I said, 'what pocket?' He raised the side of his coat up, the key was removed from his pocket, he identified the key, and the bag was opened." (Testimony of John Pope, Transcript at 33)

Ester was not advised, however, that he had a right to refuse to permit his suitcase to be opened. Pope unlocked the suitcase and found a brown substance among its contents which was later identified as almost eight ounces of heroin. Ester moves to suppress introduction of the heroin at trial for the following reasons: (1) the search of the suitcase without a warrant was invalid under *United States v. Chadwick*, 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977); (2) there was no probable cause for his arrest; and (3) the eavesdropping on Room 1920 constituted an unreasonable search in violation of the Fourth Amendment.

*I.  The Search of Ester's Suitcase*

Ester argues that the heroin found in his suitcase must be suppressed under the ruling in *United States v. Chadwick, supra,* 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538. The defendants in *Chadwick* were arrested at Boston's South Station by federal narcotics agents who suspected them of transporting drugs. The defendants had arrived on a San Diego to Boston train and were in the process of unloading their luggage, which included a double locked 200 lb. footlocker, when they were arrested. They had placed the footlocker in the trunk of the car but had not yet closed the trunk or started the car when the arrest occurred. They were then taken to the Federal Building in Boston where, approximately one hour and a half after the arrest, the narcotics agents opened the luggage without obtaining either a search warrant or the defendants' consent and found a large quantity of marihuana.

At a hearing to suppress the marihuana, the government argued that the warrantless search was justified under either the automobile exception to the warrant requirement, *Chambers v. Maroney,* 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970), or as a search incident to arrest, *Chimel v. California,* 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969). The District Court rejected both arguments, finding that the relationship between the footlocker and the automobile was coincidental and that there was no danger that the defendants might have seized a weapon or destroyed evidence contained in the luggage, 393 F.Supp. 763 (D.Mass.1975) (per Judge Tauro).

On appeal, the government made the new argument that movable personalty lawfully seized in a public place was subject to a warrantless search if probable cause existed to believe that it contained evidence of a crime. A divided Court of Appeals rejected the argument, however, on the ground that such a theory had received insufficient recognition from the Supreme Court to be accepted as a valid exception to the warrant requirement. 532 F.2d 773, 781–82 (1st Cir. 1976). On grant of certiorari, the Supreme Court affirmed. Rejecting the government's argument that the Warrant Clause of the Fourth Amendment should be confined to interests identified with the home, the Court held that the warrant requirement protects "people from unreasonable government intrusions into their legitimate

expectations of privacy."[2]   433 U.S. 1 at 7, 97 S.Ct. 2476 at 2481.

The government now seeks to distinguish *Chadwick* on the ground of important factual differences between the cases. Specifically, it argues that *Chadwick* does not extend to a situation which involves the search of a suitcase rather than, a large, double locked footlocker or to a search which is not remote in time or place from the arrest. (Government Memorandum at 15)   However, the factual elements on which the Supreme Court relied in *Chadwick* are present here.   Chief Justice Burger's opinion for the Court addressed the question of what privacy interest attaches to "luggage" in general and not simply to the particular item before it in that case. In rejecting the government's analogy to an automobile search, the opinion specifically speaks in terms of luggage:

> "Luggage contents are not open to public view, except as a condition to a border entry or common carrier travel; nor is luggage subject to regular inspections and official scrutiny on a continuing basis.   Unlike an automobile, whose primary function is transportation, luggage is intended as a repository of personal effects.   In sum, a person's expectations of privacy in personal luggage are substantially greater than in an automobile." 433 U.S. 1 at 13, 97 S.Ct. 2476 at 2484.

The one ground for distinguishing between luggage on the basis of size which is suggested by *Chadwick* is not justified on the facts of this case.   The Court noted that the traditional reasons for allowing a search incident to arrest specified in *Chimel v. California, supra,* 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685,—to safeguard the arresting officer and to prevent the destruction of evidence—were not disturbed by its ruling.   Thus, in a situation where a defendant retains easy access to his belongings even after arrest, which is more likely to be the case with smaller possessions, a warrantless search might be permissible. However, the Court set this limit:

> "Once law enforcement officers have reduced luggage or other personal property not immediately associated with the person of the arrestee to their exclusive control, and there is no longer any danger that the arrestee might gain access to the property to seize a weapon or destroy evidence, a search of that property is no longer an incident of the arrest." 433 U.S. 1 at 15, 97 S.Ct. 2476 at 2485 (footnote omitted)

Here, where Ester was handcuffed at the time of search and the suitcase was in the hands of one of the arresting officers, the search could not be justified as incident to the arrest.

The government's next argument, that *Chadwick* does not apply to a search which was not remote in time and place from the arrest, is no more persuasive.   *Chadwick's* requirement of a warrant does not depend on the amount of time or space between the arrest and the search but on the extent to which the property is within the control of the police:

> "In our view, when no exigency is shown to support the need for an immediate search, the Warrant Clause places the line at the point where the property to be

**2.** The narcotics agents in *Chadwick* also seized two locked suitcases which were broken open and searched at the same time as the footlocker.   The government justified their search as part of a routine inventory of the defendants' possessions.   The District Court held that even an inventory search requires some justification and that none of the traditional explanations for making an inventory, such as safeguarding the defendants' possessions or insulating the agents from claims of theft, were possible here where the agents had broken the lock to open the suitcases.

The District Court also stated that the search incident to arrest exception would not have been available to the government even if the argument had been made since, at the time of arrest, one suitcase was in the trunk and the other, while in the passenger compartment of the car, was not within the reach of any of the defendants.   393 F.Supp. 763, 766–77 (D.Mass. 1975).   The Court of Appeals affirmed.   532 F.2d 773, 782–84 (1st Cir. 1976).   The petition for certiorari concerned only the footlocker and the Supreme Court therefore did not consider the legality of the search of the suitcases.   433 U.S. 1, 5 n. 1, 97 S.Ct. 2476 (1977).

searched comes under the exclusive dominion of police authority." 433 U.S. 1 at 15, 97 S.Ct. 2476 at 2486. Ester's luggage was immediately placed in the possession of the federal narcotics agents and no exigent facts are suggested which required that the suitcase be searched at once. Under the circumstances, Ester is entitled to the safeguards of *Chadwick*.

■ The government argues, however, that even if Agent Pope could not lawfully search the suitcase as an incident to arrest, the search was valid because Ester consented to it. But the facts surrounding the search do not indicate that Ester did anything more than display the passive acquiescence to be expected from someone surrounded by federal agents and sitting in a government car. Although he answered Pope's questions as to the whereabouts of the key to his luggage, Ester was not asked for permission to search the suitcase or told that he had any choice but to permit the search. Indeed the behavior of the agents in asking for the key without advising him that he need not tell them where it was or consent to opening the luggage, would have suggested to any uninformed citizen that the agents had the right to search, and that there was nothing an arrestee could do about it. A citizen has the right to assume that a law enforcement officer will not propose illegal behavior, and the agent's questioning about the key could only be construed as a proposal to open the suitcase. The cases relied on by the government, which involve explicit grants of permission to search, are therefore inapposite. *United States v. Watson*, 423 U.S. 411, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976). *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). Accordingly, since we do not find that the search was consented to, the motion to suppress the heroin is granted.

*II. Probable Cause to Arrest*

Whether the government had probable cause to arrest Ester presents a more difficult question. Probable cause exists when "the facts and circumstances within [the arresting officers'] knowledge and of which they had reasonably trustworthy information were sufficient in themselves to warrant a man of reasonable caution in the belief that" an offense was being committed. *Carroll v. United States*, 267 U.S. 132, 162, 45 S.Ct. 280, 288, 69 L.Ed. 543 (1925). The government argues that the sum total of the circumstances surrounding the arrest gave the agents reason to believe that Ester was participating in a narcotics conspiracy. Ester counters that the only information Agent Pope had about a narcotics transaction related to Donnie Lewis, and that the government acted on mere suspicion in connecting Ester with the transaction and arresting him. Since the decision to suppress the heroin disposes of this motion, we do not reach the question of whether probable cause existed to arrest Ester. Strong arguments, however, are offered by both the government and the defense on this point.

*III. Eavesdropping at the Hilton Hotel*

■ Ester also questions the legality of the agents' actions in eavesdropping on the conversations in Room 1920. The introduction of these conversations goes to the question of probable cause for the arrest, which we are not deciding in this motion. However, we note that Ester's argument that eavesdropping accomplished by pressing a glass to a wall falls within the holding of *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), is dubious. *Katz* held that a person making a telephone call from a public booth justifiably relies that his conversation will not be electronically overheard. On the other hand, this circuit has ruled that there is no justified reliance against eavesdropping by the naked ear on a conversation in an adjoining room. *United States v. Ortega*, 471 F.2d 1350, 1361 (2d Cir. 1972); *cert. denied*, 411 U.S. 948, 93 S.Ct. 1924, 36 L.Ed.2d 409 (1973); *United States v. Llanes*, 398 F.2d 880, 883–84 (2d Cir. 1968). Here there is no violation of the Fourth Amendment because Ester has not shown that his expectation of privacy was interfered with any more by listening through a glass rather than with the naked ear.

The motion to suppress the heroin is granted.

It is so ordered.

## ON MOTION TO REARGUE

■ On December 13, 1977, this court granted Alonzo Ester's motion to suppress the introduction at trial of eight ounces of heroin seized from his suitcase on the ground that the search violated *United States v. Chadwick*, 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977). The government now moves to reargue, contending our ruling violates the decision in *United States v. Reda*, Dkt. No. 77–1062, 563 F.2d 510 (2d Cir. 1977), that *Chadwick* only be applied prospectively.

By a curious turn of events, the Supreme Court's decision in *Chadwick*, which narrowed the scope of the search-incident-to-arrest exception to the Fourth Amendment's Warrant Requirement, was announced earlier on the very day that the search in this case took place. Ester argues that, in the circumstances, the literal requirement of *Reda* is satisfied. We do not believe, however, that the court which decided *Reda* intended such a wooden interpretation of its opinion.

The *Reda* court noted that the reason cases involving the exclusionary rule should be given prospective application only is that the two goals of the rule, to deter illegal police conduct and preserve judicial integrity, cannot be achieved by retrospective application of new rulings. The court cited with approval the following language of the Supreme Court in *United States v. Peltier*, 422 U.S. 531, 537, 95 S.Ct. 2313, 45 L.Ed.2d 374 (1975):

> "The teaching of the retroactivity cases is that if the law enforcement officers reasonably believed in good faith that evidence they had seized was admissible at trial, the 'imperative of judicial integrity' is not offended by the introduction into evidence of that material even if decisions subsequent to the search or seizure have broadened the exclusionary rule to encompass evidence seized in that manner." *Reda, supra,* Dkt. No. 77–1062, 563 F.2d at 511.

Therefore, even though this case satisfies the literal command of *Reda*, the reason for having a rule requiring prospective application would be defeated if *Chadwick* were applied here since the federal agents involved in the search could not reasonably be expected to be familiar with a Supreme Court ruling announced only a few hours earlier. Accordingly, we hold that, under *Reda* *Chadwick* cannot be applied to the facts of this case.

■ Of course, even under pre-*Chadwick* law, the search of Ester's suitcase would be permissible only if there was probable cause for his arrest. See *United States v. Edwards*, 415 U.S. 800, 94 S.Ct. 1234, 39 L.Ed.2d 771 (1974), *United States v. Robinson*, 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973). We find that the agents here did not have probable cause for the arrest. Donnie Lewis, rather than Ester, was the primary suspect in the narcotics transaction since he is the only person specifically identified by an informant as coming to New York to buy cocaine. Yet when Lewis left for Los Angeles the day before Ester's attempted departure, the agents did not arrest him because they felt they did not have probable cause. (Transcript of Suppression Hearing at 56) The only evidence against Ester which the agents did not have against Lewis were two inconclusive conversations overheard at the Hilton Hotel and a piece of paper containing a "small quantity" of cocaine found in the waste basket of the hotel room after Ester left. (*Id.* at 29) However, three people had occupied the room, including Lewis, in whose name the room was reserved, and there is no more reason to believe that Ester was responsible for the cocaine being in the room than there is to conclude that Jones or Lewis brought it there. Indeed, Ester appears to have been in the room only for a short period of time during the morning and afternoon of June 20th.

The government argues that the standard for probable cause set out in *Carroll v. United States*, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925), has been met in this case.

However, we do not believe that the "facts and circumstances within [the arresting officers'] knowledge and of which they had reasonably trustworthy information" (*id.* at 162, 45 S.Ct. at 288) were sufficient to support the conclusion that Ester was committing an offense.

The motion to reargue is denied.

It is so ordered.